## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLIE SMITH,** | : | **CIVIL ACTION NO. 1:19-CV-2094** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KINSLEY CONSTRUCTION, INC.,** | : | |
| | : | |
| **Defendant** | : | |

### <u>MEMORANDUM</u>

Plaintiff Charlie Smith brings claims of employment discrimination against his former employer, defendant Kinsley Construction, Inc. ("Kinsley"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.*  Kinsley moves for summary judgment on all claims.  We will grant in part and deny in part the motion.

I.    **Factual Background & Procedural History**[1]

Kinsley is a "construction management and general contracting firm" located in York, Pennsylvania.  (See Doc. 1 ¶ 3; Doc. 14 ¶ 3).  Smith, who is Black, worked for Kinsley beginning in July 2011 and was over 40 years old when he began his employment.  (See Doc. 25-3 ¶¶ 1-2).  For his first two years at Kinsley, Smith worked on a gas line crew.  (See id. ¶¶ 4, 9).  The parties dispute the quality of his work in this position—Kinsley labels Smith's performance "unsatisfactory" due to the pace of his work, and Smith contends management was mostly complimentary of his work and told him he only needed to "pick up the pace a little bit."  (See id. ¶¶ 4-5; Doc. 30 ¶¶ 4-5).  During his tenure on the gas line crew, Smith also trained as a dump truck driver.  (See Doc. 25-3 ¶ 6).  Kinsley removed him from this area of work after a few months, when Smith was involved in a "rolling" accident while driving the dump truck and he required an airlift to a nearby hospital.  (See id. ¶ 8; Doc. 25-4, Smith Dep. 53:13-25, 56:4-57:17).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 25-3, 30).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

### A.    Early Warehouse Tenure & Disciplinary Action

Following Smith's dump truck accident, Kinsley moved him into a warehouse position.  (See Doc. 25-3 ¶ 9).  Kinsley owned and operated this warehouse for a customer, Columbia Gas.  (See id. ¶¶ 11-12).  In April 2013, Columbia Gas requested that Kinsley place an employee in the warehouse "to inventory, organize, and manage its materials" on the property.  (See id. ¶ 13). Smith was the only full-time employee working in the warehouse, and this "lateral move" did not result in a pay increase or any supervisory duties.  (See id. ¶¶ 15-17; Doc. 30 ¶ 16).  When Smith worked in the warehouse, Kinsley's utility division general superintendent Tim Miller supervised him, and Miller reported to Bradley Herrick, a divisional superintendent.  (See Doc. 25-3 ¶¶ 3, 19).

Smith's tenure in the warehouse lasted about six years.  (See Doc. 25-3 ¶¶ 18, 58).  During this time, he received three written disciplinary actions.  (See id. ¶ 20; Doc. 30 ¶ 20).  Smith received both the first and second written disciplinary actions on March 17, 2014.  (See Doc. 25-3 ¶ 21).  The first reminded Smith he was not permitted to use his personal phone during work hours and noted he had been given "numerous verbal warnings" about such use.  (See id. ¶ 22; Doc. 25-4 at 244). The second cited his failure to follow instructions while cutting bollards for a project.  (See Doc. 25-3 ¶ 21; Doc. 25-4 at 245).  Both notices reminded Smith to "be honest and truthful w[ith] all staff and supervisors," and were signed by Smith and Miller.  (See Doc. 25-3 ¶ 23; Doc. 25-4 at 244-45).  The third action did not occur until April 1, 2019.  (See Doc. 25-3 ¶ 38).

The parties dispute Smith's work quality over the next several years. Kinsley characterizes Smith's performance as "unsatisfactory," referencing the many conversations Columbia Gas manager Bryan Bricker endured with Smith about "parts overages and the accumulation of outdated parts." (See Doc. 25-3 ¶¶ 24-28). Kinsley states that any improvements Smith managed to make "did not meet" expectations and that both Miller and Herrick "regularly counseled" Smith about how to improve in his role. (See id. ¶¶ 29-30). For his part, Smith claims he "made great improvements" to the warehouse over the years and that Bricker "was ultimately happy with" his work. (See Doc. 30 ¶¶ 24-28). Smith also disputes his responsibility for the overages and overstocking, claiming this was the fault of Columbia Gas employees who repeatedly ordered the parts. (See id. ¶ 28). Smith further contends Miller and Herrick assured him he would receive assistance with organizing the warehouse, which "only partially materialized." (See id. ¶¶ 29-30).

**B.    April 2019 Termination**

In early April 2019, three separate events occurred within a span of ten days: Smith received his third written disciplinary action from Kinsley, Smith formally complained about a foreman named Paul Sponsler, and Smith was terminated.

On Friday, March 29, 2019, Bricker emailed Miller, Herrick, and several others about "Kinsley warehouse issues." (See Doc. 25-3 ¶ 31). Bricker's email stated:

> Kinsley,
>
> After many conversations and continuing to deal with the warehouse complaints, issues with overstocking, and materials management, we are NOT seeing any

4

> improvement with the Kinsley warehouse. We have
> decided that you have to get our materials organized and
> inventoried by 4/5/2019. Along with many other material
> management tasks that need to improve is your ability to
> identify materials that were ordered, delivered/back
> ordered/need ordered or are overstocked. The condition
> of the warehouse shows the inability of the current
> warehouse management to provide us what is required of
> our material.
>
> Please keep us informed as you work to resolve the
> warehousing issues and as always feel free to contact us
> with questions and feedback.

(See id. ¶ 32; Doc. 25-4 at 247). Kinsley submitted a printout of this email for the record, with a handwritten strikeout of the "4/5/19" date and handwritten insertion of "4/12/19." (See Doc. 25-3 ¶ 35). The parties agree Kinsley and Columbia Gas representatives spoke and settled on this later deadline for improvement. (See id. ¶ 36). On Monday, April 1, Herrick and Miller issued Smith a third written disciplinary action, which described the email Kinsley received and stated that Smith's failure to improve in the "tracking and storing" of materials by April 12 would "result in termination from the company." (See id. ¶ 38; Doc. 25-4 at 249). Smith also provided his own comments, stating his weekly hours and claiming he was "not responsible for" engineers ordering too much stock. (See Doc. 25-4 at 249; see also Doc. 25-3 ¶ 43). According to Kinsley, any improvement Smith made over the next week was "minimal." (See Doc. 25-3 ¶ 46). Per Smith, Herrick and Miller reviewed his work and told him he had done a good job. (See Doc. 30 ¶ 46).

A week later, on Monday, April 8, Columbia Gas employee Greg Radabaugh emailed Bricker, Miller, Herrick, and others to follow up on the March 29

warehouse email.  (<u>See</u> Doc. 25-3 ¶ 44).  Radabaugh asked about the plan for improvement and noted they "can't keep going down this path."  (<u>See</u> <u>id.</u>; <u>see also</u> Doc. 25-4 at 417-18).  A second Columbia Gas employee replied to Radabaugh's email that same day, recalling a December 2016 meeting that outlined several issues in the warehouse and also noting Columbia Gas's supplier had recently complained the warehouse was "a complete mess."  (<u>See</u> Doc. 25-3 ¶¶ 49-50).  Although Smith's lack of email access in 2016 was mentioned, Smith himself was not included on these March and April 2019 emails, and the email from Radabaugh did not mention whether Smith had been included in the December 2016 meeting.  (<u>See</u> Doc. 25-4 at 417-18).  The parties agree, however, that Herrick and Miller discussed their concerns about the warehouse with Smith in 2016.  (<u>See</u> Doc. 25-3 ¶ 51).

Also on April 8, Smith complained to Kinsley training manager Brett Martin after speaking with a member from foreman Paul Sponsler's crew.  (<u>See</u> Doc. 25-3 ¶ 82).  According to Smith, the crew member informed him Sponsler had made the following comment while on a job site: "it must be nice to be n****r rich."  (<u>See</u> <u>id.</u>; Smith Dep. 194:21-195:19).  Sponsler's comment had apparently upset a sheriff's deputy who was also on-site, and Smith complained to Martin about what he had been told.  (<u>See</u> Smith Dep. 195:7-12).  Martin reported it to Herrick, who investigated and spoke with Sponsler, and Sponsler admitted to making the statement.  (<u>See</u> Doc. 25-3 ¶¶ 85-86).  Sponsler received a written disciplinary action on April 9 noting "[a]ny further occurrences of this nature will result in time off without pay or termination."  (<u>See</u> <u>id.</u> ¶ 87).

Kinsley terminated Smith's employment the day following his complaint, on April 9, 2019. (See id. ¶ 58). Herrick and Gene Myers, vice president of Kinsley's utility division, made the decision to terminate Smith, and human resources director Wendy Ebersole concurred. (See id. ¶¶ 14, 56, 80). According to Kinsley, this decision was made "in response to" the emails from Columbia Gas stating its "dissatisfaction with the state of the warehouse" and because Smith "refused to accept coaching and never improved his performance" to Kinsley and Columbia Gas's expectations. (See id. ¶¶ 56-57). Smith disputes that this was the true reason. (See Doc. 30 ¶¶ 56-57). The parties agree Herrick, Myers, Miller, and Martin all met with Smith in the warehouse and informed him of the decision. (See Doc. 25-3 ¶ 58).

John Kane, who is Caucasian, replaced Smith in the warehouse position soon after Smith's termination. (See id. ¶ 59). Kane was 50 years old at the time he assumed the warehouse responsibilities. (See id. ¶ 61). Smith was born in 1960 and was 59 years old when he was terminated. (See id. ¶¶ 2, 58). Kane was an existing Kinsey employee who previously served as a "locator" before taking over Smith's duties. (See id. ¶ 60). Smith testified that Kane was assigned a desk in the warehouse prior to Smith's April 2019 termination, and that Smith was actively training Kane before his March 29 written disciplinary action. (See Smith Dep. 64:6-65:2, 134:8-135:23). Herrick testified that, after Kane took over, Kinsley has not received further complaints from Columbia Gas. (See Doc. 25-3 ¶ 62).

### C.    Other Race- & Age-Based Comments & Events

According to Smith, several employees he interacted with during his tenure in the warehouse regularly used racial slurs, and some made ageist comments. (See

Smith Dep. 133:24-196:12).  For example, Smith stated that a foreman named Joe

Lutz once called him "a geriatric" and asked: "Why don't you just quit and retire

before they get rid of you?"  (See id. at 137:9-17, 138:12-23).  Smith could not recall

the date of this interaction.  (See id. at 137:18-20).  An employee named Bob Lintz

reportedly told Smith "all you guys are good for is welfare and stealing stuff" and

said Kinsley needed "somebody younger in this warehouse."  (See id. at 140:12-

141:4, 162:8-24).  A foreman named Adam Cherry purportedly said to Smith "what's

up n****r brother."  (See id. at 152:21-25).  Yet another foreman, Tim Blessing,

often used the term "you colored people."  (See id. at 145:16-20).  Per Smith, when

he requested help in the warehouse, both Lintz and Lutz replied similarly with:

"Why don't you check your slave manual?"  (See id. at 190:3-12; see also Doc. 25-4 at

444).  Smith stated that both Lintz and Lutz referred to him as a "spade" and a

"spook."  (See Smith Dep. 183:3-22, 184:4-11).

       In addition to the foremen comments, a crew leader named Gary Anthony

wore a "Klan mask" in front of Smith sometime in 2017 or 2018.  (See Doc. 25-3

¶ 71).  A photo of Anthony in this mask was produced during discovery, and Smith

described the mask as a white sandbag with the eyes cut out and a cross at the top.

(See Smith Dep. 190:17-191:4).  A "Kinsley jacket" also appears in the photo.  (See

id. at 191:1-6).  Smith stated he felt intimidated and feared for his safety due to this

incident.  (See id. at 191:6-8, 191:20-25).

       Smith further stated that Sponsler, the subject of Smith's April 2019

complaint, used racial epithets frequently and with impunity.  (See id. at 87:8-10,

141:2-142:15, 183:3-22).  Smith and Sponsler saw each other on a daily basis at the

warehouse.  (<u>See</u> <u>id.</u> at 144:22-145:7).  Sponsler often used the term "n****r-rich" and spoke about needing to "n****r rig" a piece of equipment.  (<u>See</u> <u>id.</u> at 141:4-22). When Smith once asked for help, Sponsler answered: "Why don't you check your n****r manual?"  (<u>See</u> <u>id.</u> at 190:3-13).  Smith stated that Sponsler called him "a lazy n word" daily, and Lutz and Lintz had also used that pejorative.  (<u>See</u> <u>id.</u> at 145:8-146:4).  Smith maintained that use of the n-word was "rampant" at Kinsley, and that Sponsler used it so often it seemed "embedded in his brain."  (<u>See</u> <u>id.</u> at 145:21-146:4, 153:7-12).  Despite this testimony, the parties agree that Sponsler acted as the best man in Smith's wedding in June 2016, and that Sponsler invited Smith to his home on several occasions.  (<u>See</u> Doc. 25-3 ¶¶ 89-90).  But according to Smith, Sponsler only invited him to "show off" that he had a Black friend, and stated Sponsler embarrassed him at his wedding by drinking too much and using the n-word during the festivities.  (<u>See</u> Smith Dep. 143:11-23, 148:2-23).  Sponsler also reportedly made age-based comments to Smith, such as "you're getting too old" and "you're up there."  (<u>See</u> <u>id.</u> at 163:6-17).

The parties agree that Smith received an employee handbook at the beginning of his employment and that this handbook includes a harassment policy. (<u>See</u> Doc. 25-3 ¶¶ 77-78).  This policy encourages employees to report any instance of discriminatory harassment to human resources or a project or division manager. (<u>See</u> <u>id.</u> ¶ 79).  The parties further agree that Smith never reported any of the aforementioned conduct to Wendy Ebersole, Kinsley's director of human resources. (<u>See</u> <u>id.</u> ¶¶ 80-81).  Finally, they agree that Smith did not report or share the "Klan

mask" incident, or the resulting photo, with any member of Kinsley's management.
(See id. ¶¶ 71-72).

Smith insists he informally complained to management about the racially
offensive language he experienced in the warehouse. (See Doc. 30 ¶¶ 72, 81, 96).
Smith stated he brought his concerns to Miller "several times." (See Smith Dep.
182:4-12, 192:12-193:1). Smith further averred that he complained to Martin "as
often as [he] could" about employees "walking around here saying the n word a
lot." (See id. at 83:4-84:12, 85:2-20). Smith also attested that he "mentioned quite a
few things" to Herrick, but that Herrick "brushed it under the table." (See id. at
181:19-182:3). Herrick, on the other hand, testified he had no knowledge of any
mention of a "slave manual"; of Smith being referred to as "geriatric"; and, besides
the Sponsler incident in April 2019, of any slurs or discriminatory comments made
to Smith. (See Doc. 25-4, Herrick Dep. 52:4-9, 56:20-58:3). The parties agree that
Herrick, Myers, Miller, and Martin "never made any offensive comments" about
Smith's race or age to him or in his presence. (See Doc. 25-3 ¶ 96).

In support of his claim that Kinsley discriminated against him, Smith points
to several Kinsley employees he believes were treated more favorably than him:
Adam Cherry, a man identified only as Ted, and Gary Anthony. Cherry, a 40-year-
old Caucasian employee, was demoted from foreman to pipe installer in 2019 after
he caused damage to underground gas lines. (See id. ¶ 65). Cherry voluntarily
resigned from Kinsley after his demotion. (See id. ¶ 67). Ted was reportedly a pipe
layer who was terminated for theft. (See id. ¶ 69). Herrick testified he recalled
making the decision to fire Ted, but could not recall if he had been rehired and was

not sure of Ted's race or last name.  (See id. ¶ 70; Herrick Dep. 127:14-128:4, 129:14-130:7).  Finally, Anthony wore the "Klan mask" in Smith's presence, and Anthony and Smith engaged in a verbal altercation in 2018.  (See Doc. 25-3 ¶ 71).  Kinsley formally disciplined Anthony for the "Klan mask" incident upon learning about it during the instant litigation.  (See id. ¶¶ 72-74).

### D.    Procedural History

Smith filed the instant lawsuit in December 2019, alleging race discrimination, age discrimination, and retaliation under state and federal law. Kinsley now moves for summary judgment on all of Smith's claims.  The motion is fully briefed and ripe for disposition.

## II.    Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.

See Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

### A.   **Race Discrimination**

Title VII prohibits an employer from discharging "any individual . . . because of such individual's race."  See 42 U.S.C. § 2000e-2(a)(1).  The PHRA similarly makes it unlawful for an employer to discharge an individual due to his race.  See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[2]  Under the McDonnell Douglas burden-shifting standard, a Title VII plaintiff establishes a *prima facie* case of discrimination by presenting sufficient evidence that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  To establish the fourth element, a plaintiff may, but is not required to, show he was replaced by someone outside of the protected class.  See Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) (nonprecedential) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 347 (3d Cir. 1999)).

    If the plaintiff proves a *prima facie* case, the burden of production shifts to the employer to identify a "legitimate, nondiscriminatory reason" for its conduct.

---

[2] The court reviews PHRA claims under the same standards as Title VII claims.  See Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802).  The defendant's burden at this stage is "'relatively light,'" and is a burden of production only.  See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006)).  Assuming the employer meets its burden, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reason is pretextual.  See Fuentes, 32 F.3d at 763.

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000) (quoting Fuentes, 32 F.3d at 764).  The plaintiff may call attention to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons."  See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 764).  Our court of appeals has recognized that "proof of a discriminatory atmosphere may be relevant in proving pretext" because it contextualizes an employer's decisionmaking process.  See Creely v. Genesis Health Ventures, Inc., 184 F. App'x 197, 200 (3d Cir. 2006) (nonprecedential) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 546 (3d Cir. 1992)).  On the other hand, little weight is accorded to "stray remarks by non-decisionmakers," especially if those remarks are made "temporally remote

13

from the date of decision."  See Ezold, 983 F.2d at 545 (citing Price Waterhouse

v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

In the matter *sub judice*, Kinsley argues Smith cannot meet the fourth prong

of his *prima facie* case, nor can he adduce sufficient evidence of pretext.  We

disagree on both fronts.  Smith, as a Black man, is a member of a protected class;

Kinsley does not dispute that he was qualified for the warehouse position; and the

parties agree Kinsley terminated Smith's employment on April 9, 2019.  (See Doc.

25-3 ¶¶ 2, 58).  Furthermore, Smith's replacement by Kane—a Caucasian man

outside of Smith's protected class—satisfies the fourth prong of the *prima facie*

case.[3]  See Johnson, 214 F. App'x at 242.  The burden therefore shifts to Kinsley to

produce a legitimate, nondiscriminatory reason for Smith's termination.  See

Fuentes, 32 F.3d at 763.  Kinsley carries its "relatively light" burden by referencing

complaints from Columbia Gas regarding the warehouse's organization.  See

Burton, 707 F.3d at 426.

Turning to pretext, we are not at all persuaded by Kinsley's insistence that

we dismiss the racially offensive comments and events during Smith's employment

as mere "stray remarks by non-decisionmakers."  Cf. Ezold, 983 F.2d at 545; (see

also Doc. 25-1 at 15).  Crediting Smith's version of events, he was subjected to

brazen racial hostility by multiple foremen at Kinsley.  These instances would

include Lutz and Lintz telling Smith to check his "slave manual," and regularly

---

[3] Kinsley's focus on Smith's other proffered comparators, without any
mention of Kane, the very individual who replaced Smith in his warehouse position,
is misguided.  (See Doc. 25-1 at 13-15).

referring to him as a "spade," "spook," and "lazy n-word"; Cherry greeting Smith by saying "what's up n****r brother"; Blessing referring to Smith as "you colored people"; and Lintz opining that people like Smith were only "good for . . . welfare and stealing stuff." (See Smith Dep. 140:12-141:4, 145:8-146:4, 152:21-25, 183:3-22, 184:4-11, 190:3-12). Moreover, the parties agree that Anthony wore a "Klan mask" in Smith's presence in 2017 or 2018, (see Doc. 25-3 ¶ 71), and Smith stated the incident caused him to fear for his own safety at work, (see Smith Dep. 191:6-25).

Finally, by Smith's account, Sponsler was the worst offender: he used terms like "n****r-rich," "n****r-rig," "n****r manual," and "lazy n-word" as part of his everyday vocabulary at Kinsley, not simply during the April 2019 incident for which he was disciplined. (See Smith Dep. 87:8-10, 141:2-19, 145:21-146:4, 190:3-13). Smith testified he brought these issues to Herrick, Miller, and Martin, but no action was taken. (See id. at 83:4-84:12, 181:19-182:3, 182:8-20, 192:12-193:1). Thus, not only did Kinsley foremen repeatedly mistreat Smith due to his race, but Smith's supervisory chain of command—to include Herrick as one of the supervisors responsible for deciding to terminating Smith, (see Doc. 25-3 ¶¶ 19, 56)—knew of, and ignored, the foremen's appalling behavior. In short, Smith's testimony paints a grim picture of a workplace rife with racial hostility and could establish a "discriminatory atmosphere" for purposes of proving pretext. See Creely, 184 F. App'x at 197; Ezold, 983 F.2d at 546. Although Herrick professed no knowledge of the use of any such language during Smith's tenure, save the Sponsler incident in April 2019, credibility disputes are reserved for the jury. See El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007). A rational factfinder who credits Smith's version of events could

easily conclude "an invidious discriminatory reason was more likely than not" the cause for Smith's termination.  See Shaner, 204 F.3d at 501.  At this juncture, we draw all reasonable inferences in favor of Smith as the nonmovant.  See Thomas, 749 F.3d at 222.  For these reasons, summary judgment is not warranted on Smith's racial discrimination clams.

**B.    Age Discrimination**

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]"  See 29 U.S.C. § 623(a)(1).  The PHRA also forbids discrimination based on an employee's age.  See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[4]  Age discrimination claims based on circumstantial evidence follow the McDonnell Douglas three-step burden-shifting framework.  See Willis, 808 F.3d at 644; see generally McDonnell Douglas, 411 U.S. 792.  To establish a *prima facie* case of age discrimination, a plaintiff must prove (1) he is a member of the protected class, *i.e.*, he is at least 40 years old; (2) he is qualified for the position in question; (3) he suffered an adverse employment action; and (4) he was "replaced

---

[4] The court reviews PHRA age discrimination claims under the same standards as ADEA claims.  See Fasold v. Just., 409 F.3d 178, 184 n.8 (3d Cir. 2005) (citing Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)).

by another employee who was sufficiently younger[5] so as to support an inference of a discriminatory motive."  See Willis, 808 F.3d at 644 (citing Burton, 707 F.3d at 426).  The burden of establishing a *prima facie* case "is not onerous," see Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)), and presents a "low bar" for employment discrimination plaintiffs, see Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citation omitted).

If a plaintiff can demonstrate a *prima facie* case of age discrimination, the burden then shifts to the employer to offer a "legitimate nondiscriminatory reason" for the adverse employment action.  See Willis, 808 F.3d at 644 (citation omitted); McDonnell Douglas Corp., 411 U.S. at 802.  After the defendant produces such evidence, the burden rebounds to the plaintiff to show the proffered reason is pretext.  See Willis, 808 F.3d at 644 (citing Burton, 707 F.3d at 426-27).  To ultimately prevail on an age discrimination claim, the plaintiff "must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action."  See id. (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)).

---

[5] A plaintiff's replacement need not be outside of his protected class for purposes of a *prima facie* ADEA claim.  See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996).  Furthermore, our court of appeals does not require any particular age difference between a plaintiff and his replacement to conclude the replacement was "sufficiently younger."  See Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (standard satisfied when retained employees were eight and 16 years younger); Sempier v. Johnson & Higgins, 45 F.2d 724, 729 (3d Cir. 1995) (same when replacements were four and 10 years younger).

For the purposes of summary judgment in this matter, Kinsley only contests whether Smith can establish pretext under his ADEA claim.  Smith attempts to show pretext by referencing the ageist comments that Kinsley foremen made against him, arguing these comments "reflected the view of" Kinsley.  (See Smith Dep. 138:8-139:14).  We are not persuaded.  Smith testified the racially offensive comments and actions by Kinsley foremen occurred on a daily basis.  (See, e.g., id. at 145:8-146:4).  *Per contra*, Smith was unable to provide dates for most of the age-related comments and did not claim they occurred with any particular regularity.  (See id. at 137:11-20).  Smith also does not suggest the foremen who made ageist comments had any decisionmaking authority regarding his employment.  (See Doc. 25-3 ¶ 95).  Moreover, neither Smith's interrogatory answers nor his summary judgment briefing argues that he experienced an abusive work environment due to the foremen's ageist remarks, or that he complained about these statements.  (See Doc. 25-4 at 444; compare Doc. 30 ¶ 94 with id. ¶ 95).  We conclude the ageist comments and speculation by Kinsley foremen, while inappropriate and offensive, constitute "stray remarks by non-decisionmakers."  See Ezold, 983 F.2d at 545.  On the present record, Smith has not met his burden to point to evidence sufficient to show that Kinsley's decision to terminate him was a pretext for age discrimination.  Cf. Willis, 808 F.3d at 644.  We will grant summary judgment on Smith's age discrimination claims.

## C.      Retaliation

Title VII prohibits an employer from discriminating against an employee because he, *inter alia*, "has opposed any practice made an unlawful employment

practice by this subchapter." <u>See</u> 42 U.S.C. § 2000e-3(a).  The PHRA likewise forbids discrimination "against any individual because such individual has opposed any practice forbidden by this act."  43 PA. STAT. AND CONS. STAT. ANN. § 955(d).[6] To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action.  <u>See</u> <u>Carvalho-Grevious v. Del. State Univ.</u>, 851 F.3d 249, 257 (3d Cir. 2017) (citing <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir. 2006)).

For purposes of summary judgment, Kinsley challenges only the causation element of Smith's *prima facie* case.  For retaliation claims, the timing between an employee's protected activity and the adverse employment action may be indicative of causation if it is "unusually suggestive of retaliatory motive."  <u>See</u> <u>Shaner</u>, 204 F.3d at 505 (citing <u>Krouse</u>, 126 F.3d at 503).  A "bright line rule" for unusually suggestive timing does not exist, but "temporal proximity" alone is rarely sufficient to establish causation.  <u>See</u> <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 (3d Cir. 1997) (citing <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989) (two-day lapse sufficient to infer causation)).  The court is not limited to considering temporal proximity, and a plaintiff may establish causation by pointing to "any other evidence in the record sufficient to support the inference of retaliatory animus."

---

[6] Our court of appeals generally applies the same analytical framework to PHRA retaliation claims as to Title VII retaliation claims.  <u>See</u> <u>Connelly</u>, 809 F.3d at 791 n.9 (citing <u>Krouse v. Am. Sterilizer</u>, 126 F.3d 494, 500 (3d Cir. 1997)).

See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232-33 (3d Cir. 2007)

(citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)).

Title VII retaliation claims also follow the McDonnell Douglas burden-
shifting framework.  See Carvalho-Grevious, 851 F.3d at 257 (citing Daniels v. Sch.
Dist. of Phila., 776 F.3d 181, 198 (3d Cir. 2015)).  If the employee succeeds in proving
his *prima facie* case, the burden shifts to the employer to produce a legitimate,
nonretaliatory reason.  See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183,
189 (3d Cir. 2003).  After the employer articulates such a reason, the plaintiff bears
the burden of demonstrating that the given explanation is mere pretext and
"unworthy of credence."  See Carvalho-Grevious, 851 F.3d at 262 (quoting Daniels,
776 F.3d at 199).

Kinsley contends Smith cannot establish the causation element of his *prima
facie* case, nor can he rebut the nonretaliatory reason for his termination.  Not so.
On April 8, Smith complained about Sponsler's use of the term "n****r rich" on a
job site.  (See Doc. 25-3 ¶ 82).  Kinsley terminated Smith's employment the following
day, on April 9—a single day after Smith complained about Sponsler's remark.  (See
Doc. 25-3 ¶ 58).  Herrick, as one of the supervisors responsible for making the
termination decision, (see id. ¶ 56), was aware of Smith's April 8 complaint about
Sponsler, (see Herrick Dep. 116:7-17).  We conclude Smith has presented sufficient
evidence of causation—this is the rare case in which a mere one-day lapse between
protected activity and termination, along with the decisionmaker's knowledge of
the employee's protected activity, is "unusually suggestive of retaliatory motive."
See Shaner, 204 F.3d at 505; Jalil, 873 F.2d at 708.

Kinsley, for its part, points to the 2019 Columbia Gas emails to satisfy its burden to produce a legitimate, nonretaliatory reason.  See Shellenberger, 318 F.3d at 189.  To survive summary judgment, Smith therefore must provide sufficient evidence that Kinsley's stated reason is pretextual, and the real reason is retaliation.  See Carvalho-Grevious, 851 F.3d at 257.

It is beyond peradventure that an employee may not attempt to "insulate" himself from adverse employment action by availing himself of Title VII's antiretaliation protections "after committing non-protected conduct that was the basis for the decision to terminate."  See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 137 (3d Cir. 2006); see also Proudfoot v. Arnold Logistics, LLC, 59 F. Supp. 3d 697, 711 (M.D. Pa. 2014) (Conner, C.J.), aff'd, 629 F. App'x 303 (3d Cir. 2015) (nonprecedential).  Kinsley urges us to weigh the "timing and nature" of Smith's report as well as his past relationship with Sponsler, arguing that he opportunistically reported Sponsler's behavior to create a legal claim.  (See Doc. 25-1 at 15-20).  However, the court's function at summary judgment does not include weighing the credibility of witness testimony.  See El, 479 F.3d at 237.  According to Smith, his April 8 report about Sponsler was only the latest in a veritable litany of complaints to Miller, Herrick, and Martin about the racially abusive working environment he experienced at the warehouse.  (See Doc. 30 ¶¶ 72, 81, 96; Smith Dep. 83:4-84:12, 181:19-182:3, 182:8-20, 192:12-193:1).

Moreover, Kinsley provides no explanation for the sudden acceleration of Smith's termination.  The parties agree Kinsley negotiated with Columbia Gas to provide a deadline of April 12 to improve the warehouse, and Smith's written

disciplinary action reflected this deadline.  (See Doc. 25-3 ¶¶ 35-36, 40).  Kinsley leans on the "most recent emails" from Columbia Gas to bolster its decision to terminate Smith on April 9.  (See id. ¶ 56).  Yet neither of the April 8 emails from Columbia Gas employees state a desire to terminate Smith or move up the agreed-upon deadline of April 12.  (See id. ¶¶ 47, 49-50).  Smith's termination therefore occurred a full three days before Kinsley expected him to have cleaned up the warehouse.  (See id. ¶ 58).  Drawing all reasonable inferences in favor of Smith, a factfinder who credits Smith's version of events could find Kinsley's stated reason for the accelerated termination decision implausible and pretextual.  See, e.g., Jalil, 873 F.2d at 709 (noting timing of plaintiff's firing "could suggest the very real possibility that [the employer] seized upon this instance of insubordination to fire" him (internal citation and quotation marks omitted)).  As with Smith's racial discrimination claims, there are numerous material facts in dispute regarding whether his termination was pretext for retaliation.   Therefore, we will deny Kinsley's motion for summary judgment on these claims.

**IV.**   **Conclusion**

We will grant in part and deny in part Kinsley's motion (Doc. 25) for summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 28, 2022